Jeffrey D. Kaliel (CA Bar No. 238293)
Sophia G. Gold (CA Bar No. 307971)
jkaliel@kalielpllc.com
sgold@kalielpllc.com
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783

Attorneys for Plaintiff James Foreman
and the Putative Class

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
### (San Jose Division)

| | |
|---|---|
| JAMES FOREMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | **CLASS ACTION COMPLAINT** |

Plaintiff JAMES FOREMAN, on behalf of himself and all others similarly situated, sues Defendant BANK OF AMERICA, N.A., and alleges:

## INTRODUCTION

1. For consumers who authorize recurring electronic funds transfers ("EFTs") from their checking accounts—for anything from gym memberships to loan payments—federal law provides a very important right: upon notice to his bank that a consumer no longer authorizes the recurring debits, his bank is obligated to immediately cease such debits. Defendant Bank of America, N.A. ("BANA") fails to allow consumers to avail themselves of this right, and places hurdles to consumers' use of this right—namely, by imposition of a large fee before the right can be exercised.

2. This federally provided right to end recurring EFTs is especially important for consumers who unwittingly fall into predatory and illegal internet payday loans.

3. Payday loans and high-cost installment loans trap consumers into debt they cannot afford. Typically, the lenders of these "payday debt traps" require consumers to provide their bank account information and an authorization to electronically debit future payments from the consumer's bank account.

4. California severely restricts payday loans. Only lenders who receive a license from the Department of Corporations and abide by the interest and fee limits are authorized to make payday loans. The maximum amount of those loans is capped, as are the fees a payday lender can charge. Loans made by unlicensed lenders must comply with California's constitutional usury restrictions.

5. Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in California (the "Illegal Payday Lenders"). These loans ("Illegal Payday Loans") feature interest rates of 400%, 500%, and higher.

6. Despite the illegality of these payday debt traps in many states, predatory lenders are able to evade state licensing and usury laws through internet lending and the use of electronic funds transfers withdrawn directly from consumers' bank accounts.

7. Federal law provides consumers with the right to withdraw authorization for continued electronic withdrawals of these usurious loan payments. The Electronic Funds Transfer Act and Regulation E provide this right.

8. BANA, however, hinders the use of this right and improperly profits off this right by charging its accountholders $30 "Stop Payment Fees" ("SPFs").

9. This lawsuit challenges BANA's practice of profiting from and hindering revocation of authorization for pre-authorized electronic funds transfers by charging $30 Stop Payment Fees in order to do so.

10. Plaintiff was the victim of an illegal predatory lending scheme. After learning of the illegality of his loans, Plaintiff notified BANA that the lenders were no longer authorized to make withdrawals from his account. BANA stated that it would only stop the payments if Plaintiff would pay a $30 SPF for each illegal loan. Plaintiff had no choice but to pay this fee if he was to escape from the illegal debt trap in which he found himself.

11. BANA's practices violate the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e, and California consumer protection law. Plaintiff, on behalf of himself and the putative class, seeks his actual and proximate damages, statutory damages, costs, and attorney's fees.

## **PARTIES**

12. Plaintiff James Foreman is a natural person residing in this District and Division. He is also a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6).

13. Bank of America, N.A. is a "financial institution" as defined and governed by the EFTA, 15 U.S.C. § 1693a(9), with its principal office in Charlotte, North Carolina.

## JURISDICTION AND VENUE

14. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 1693m and 1693h.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BANA regularly does business in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### EFTs and Payday Loans

16. An EFT is the electronic transfer of money from one bank account to another, either within a single financial institution or across multiple institutions, via computer-based systems, without the direct intervention of bank staff. Consumers commonly use EFTs to pay insurance and utility bills, loan payments, and personal services memberships such as gyms.

17. A payday loan is a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to consumers to provide funds in anticipation of an upcoming paycheck. A borrower obtaining an online payday loan must usually enter into an "Authorization to Initiate ACH Transactions" with the lender that permits the lender to "initiate" credit and debit entries on the loan.

18. Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

19. Payday loans feature exorbitant annual percentage rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

20. If a borrower is unable to repay the full amount of the loan on the due date, the lender typically gives the borrower the option to "roll over" the loan balance by paying another "fee," usually equal to the initial fee at the time of loan funding.

The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

21. Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid. Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

22. For these and other reasons, California severely restricts payday loans.

23. Only licensed payday lenders may make payday loans. The Illegal Payday Lenders used by Plaintiff Foreman—and to whom he wanted to stop recurring EFTs—were at no time licensed by the Department of Corporations.

24. Illegal Payday Lenders, while not permitted to operate in California, have simply moved to the Internet in order to solicit desperate borrowers into Illegal Payday Loans using an online application process. This scheme could not have been accomplished without the complicity of Defendant who provided Illegal Payday Lenders with access to the ACH Network.

25. The Illegal Payday Lenders are subject to the California Constitution's maximum annual interest rate of 10% for loans used "primarily for personal, family, or household purposes." Cal. Const. art. XV, § 1.

26. In addition, the Illegal Payday Lenders are subject to California statutory provisions providing that parties may: ". . . contract for the payment and receipt of a rate of interest not exceeding twelve dollars on the one hundred dollars for one year and not exceeding that rate for a greater or less sum or for a longer or shorter time, in which case such rate exceeding seven dollars on one hundred dollars shall be clearly expressed in writing." Cal. Civ. Code § 1916-1.

27. Yet such lenders charged interest rates in the hundreds of percent.

28. Under California law, a contract to pay interest in excess of the lawful maximum is void and the lender may not recover interest on the loan. Furthermore, if

5
CLASS ACTION COMPLAINT

the borrower actually pays interest at a usurious rate he may recover the amount so paid in an action brought for that purpose.

## The Electronic Fund Transfer Act

29. The Electronic Fund Transfer Act (EFTA) gives consumers the right to stop payment of preauthorized electronic fund transfers.

30. Congress enacted the EFTA in 1978 with the "primary objective" to provide for individual consumer rights with respect to electronic fund and remittance transfers. 15 U.S.C. § 1693.

31. The EFTA "sets minimum safeguards for consumers who arrange for regular payments (such as insurance premiums or utility bills) to be deducted automatically from their bank accounts." S. Rep. No. 95-1273 supra, at 31. These safeguards protect the consumer's control over his or her own account.

32. Under the EFTA, stopping preauthorized withdrawals is meant to be as easy as initiating them. Accordingly, "[a] consumer is given the right to stop payment on a preauthorized transfer by notifying his financial institution orally or in writing up to 3 business days before the scheduled date of transfer. In the case of an oral notice, the financial institution may require written confirmation within fourteen days." S. Rep. No. 95-1273 supra, at 31; *see also* 15 U.S.C. § 1693e.

33. A consumer may stop preauthorized electronic payments by informing his or her financial institution that the electronic transfers are no longer authorized. *See* 12 C.F.R. Pt. 1005, Supp. I, cmt. 10(c). "Once a financial institution has been notified that the consumer's authorization is no longer valid, it must block all future payments for the particular debit transmitted by the designated payee-originator." *Id*. Because the electronic funds transfers are considered unauthorized electronic funds transfers and the consumer has provided notice to the financial institution, the financial institution is liable for any subsequent electronic funds transfers. *See* 15 U.S.C. § 1693g; *see also id*. § 1693a(12) (defining the term "unauthorized electronic fund transfer).

6
CLASS ACTION COMPLAINT

34. A consumer may stop payment of a pre-authorized electronic funds transfer pursuant to § 1693e by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. *See* 12 C.F.R. Pt. 1005, Supp. I, cmt. 10(c). "The financial institution must honor an oral stop-payment order made at least three business days before a scheduled debit. If the debit item is resubmitted, the institution must continue to honor the stop-payment order (for example, by suspending all subsequent payments to the payee-originator until the consumer notifies the institution that payments should resume)." *Id*.

**BANA And Other Banks Routinely Violate EFTA Rights to Cease Recurring EFTs**

35. According to the National Consumer Law Center, "Advocates around the country routinely hear from people whose financial institution refused their repeated requests to stop recurring payments to payday lenders. The financial institution often claims that there is nothing it can do to stop the debits or that the consumer is required to stop the payment by going through the lender and revoking authorization for the debit. While Regulation E permits financial institutions to require written confirmation from the customer that authorization has been revoked, the law is clear that the financial institution must enter the initial stop-payment order based on an oral request." September 29, 2014 Letter from National Consumer Law Center to The Honorable Janet L. Yellen, Chairwoman Board of Governors of the Federal Reserve System, The Honorable Richard Cordray, Director Consumer Financial Protection Bureau, The Honorable Tom Curry, Comptroller Office of the Comptroller of the Currency, The Honorable Martin Gruenberg, Chairman Federal Deposit Insurance Corporation, The Honorable Debbie Matz, Chairwoman National Credit Union Administration, Jan Estep, President and Chief Executive Officer NACHA — The Electronic Payments Association ("NCLC Letter").

36. According to the NCLC Letter, "Unauthorized charges should be blocked or reversed without charge. But if a consumer is attempting to block future unauthorized charges as opposed to reversing one that already occurred, financial

institutions often charge stop-payment fees. Consumers also may not know to contest the payments as unauthorized and may simply ask that the payments be stopped. Even if the consumer says that the payment is illegal and unauthorized, the bank may still charge a stop payment fee."

37. Moreover, "Under both Regulation E and NACHA rules, a consumer may initiate a stop-payment order by an oral request. The RDFI may ask the consumer to follow up with a written request and to confirm that the consumer has revoked the payee's authorization. The initial stop-payment order may expire in 14 days if the consumer does not follow up with the requested information. But the RDFI may not refuse to honor the initial oral stop-payment order pending receipt of that information. Indeed, the requirement that financial institutions stop payments would be superfluous if consumers could, or were required to, effectively stop payments with the payee directly. The UCC, EFTA and NACHA rules do not specifically address stop-payment fees. But fees that are so high as to inhibit the right to stop payment should be viewed as violating that right. Such fees are also potentially unfair, deceptive or abusive."

### Plaintiff Foreman's Experience

38. Plaintiff took out loans with predatory lenders, including MyPaydayLoan.com. MyPaydayLoan.com charged exorbitantly high interest rates in violation of California law, and was not licensed to make payday loans in California, also in violation of California law.

39. As a part of his loan agreements with the predatory lenders, including MyPaydayLoan.com, Plaintiff provided a preauthorization for the predatory lenders to electronically withdraw payments from his BANA checking account.

40. After learning that the loans were illegal and thus invalid in the State of California, in approximately November 2017, Plaintiff called BANA and informed BANA that he was withdrawing his authorization for continued payments.

41. BANA stated it would not stop the illegal payments, unless Plaintiff paid a $30 Stop Payment Fee. This violated the EFTA. However, Plaintiff had no choice but to pay this fee if he was to escape from the illegal debt trap in which he found himself.

42. This same pattern also occurred with another of Plaintiff's predatory internet payment loans, in August 2017. Again, Plaintiff was forced to pay a $30 Stop Payment Fee to stop payments to the predatory loan company. This also violated the EFTA.

43. BANA's policy violates EFTA; hinders consumers' rights to extricate themselves from devastating and illegal financial transactions; and provides a significant and unjustified revenue source for BANA doing nothing more than performing its statutory duty.

## CLASS ALLEGATIONS

44. Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23. The proposed class is defined as:

> All holders of a BANA checking account who, within the applicable statute of limitations, incurred one or more SPFs to cease recurring EFTs (the "SPF Class").

In addition, the proposed California subclass is defined as follows:

> All holders of a BANA checking account in California who, within the applicable statute of limitations, incurred one or more SPFs to cease recurring EFTs (the "California SPF Class").

The classes are collectively referred to as the "Classes."

45. Plaintiff brings this action on his own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23. Excluded from the class are BANA,

its subsidiaries and affiliates, its officers, directors and member of their immediate families and any entity in which defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

46. Plaintiff reserves the right to modify or amend the definition of the proposed Classes if necessary before this Court determines whether certification is appropriate.

47. This case is properly brought as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and all requirements therein are met for the reasons set forth in the following paragraphs.

48. *Numerosity under Fed. R. Civ. P. 23(a)(1)*. The members of the Class are so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to BANA's records. BANA has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

49. *Commonality under Fed. R. Civ. P. 23(a)(2)*. There are numerous questions of law and fact common to the Class relating to BANA's business practices challenged herein, and those common questions predominate over any questions affecting only individual Class members. The common questions include, but are not limited to:

    a) Whether BANA improperly assessed SPFs;

    b) Whether BANA's assessment of SPFs on unauthorized EFTs violated the EFTA;

    c) Whether BANA's assessment of SPFs on unauthorized EFTs is unfair under the UCL;

d) Whether Plaintiff and other members of the Class have sustained damages as a result of BANA's conduct.

50. *Typicality under Fed. R. Civ. P. 23(a)(3)*. Plaintiff's claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by BANA, as described herein.

51. *Adequacy of Representation under Fed. R. Civ. P. 23(a)(4)*. Plaintiff is an adequate representatives of the Class in that he has an BANA checking account and has suffered damages as a result of BANA's conduct. In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b) There is no hostility of interest between Plaintiff and the unnamed Class members;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

52. *Predominance under Fed. R. Civ. P. 23(b)(3)*. The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues. As such, the "commonality" allegations are restated and incorporated herein by reference.

53. *Superiority under Fed. R. Civ. P. 23(b)(3).* A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of BANA are enormous, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class

members will continue to suffer losses and BANA's misconduct will proceed without remedy. In addition, even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

54. All conditions precedent to bringing this action have been satisfied and/or waived.

## COUNT ONE: VIOLATIONS OF 15 U.S.C. § 1693e
**(On behalf of the Classes)**

55. Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

56. As alleged above, Plaintiff and the putative class members attempted to stop a withdrawal on their BANA account by instructing BANA that they did not want a particular lender to automatically withdraw funds from their account any longer.

57. In violation of 15 U.S.C. § 1693e, and as a common practice, BANA assesses a $30 "stop-payment fee" when a consumer instructs BANA to stop an automatic payment

58. As a result of these violations, Plaintiff and the putative class members suffered concrete and particularized harms. In particular, they suffered the imposition of unnecessary fees as a result of BANA's violations.

59. BANA's noncompliance with 15 U.S.C. § 1693e is intentional in part because these practices are in direct contravention to a consumer's right to stop payment.

60. Accordingly, BANA is liable to Plaintiff and the class members for any actual damages, statutory damages, attorney's fees, and costs. 15 U.S.C. § 1693m.

## COUNT TWO: Violation of California's Unfair Competition Law, Unlawful Prong
### (On behalf of the California Subclass)

61. Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

62. Defendant's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq*.

63. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

64. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

65. Defendant's conduct violates the UCL's "unlawful" prong in the following respects, among others: Defendant inhibited Plaintiff's statutory right to instruct BANA to stop EFTs.

66. The conduct of Defendant was not motivated by any business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

67. Defendant's conduct was substantially injurious to consumers in that they have been forced to endure unauthorized EFTs and forced to pay fees to enjoy their statutory rights.

68. As a result of Defendant's violations of the UCL's "unlawful" prong, Plaintiff and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

**COUNT THREE: Violation of California Unfair Competition Law, Unfair Prong**
**(On behalf of the California Subclass)**

69. Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

70. Defendant's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq*.

71. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

72. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

73. Defendant's conduct violates the UCL's "unfair" prong in the following respects, among others: Defendant inhibited Plaintiff's statutory right to instruct BANA to stop EFTs.

74. Defendant's conduct was not motivated by any business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members

of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

75. The harm to Plaintiff and Class Members arising from Defendant's unfair practices relating to the imposition of unlawful payday loans outweighs the utility, if any, of those practices.

76. Defendant's unfair business practices relating to the requirement of SPFs to stop payments to unlawful payday lenders are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

77. Defendant's conduct was substantially injurious to consumers in that they have been forced to endure unauthorized EFTs and forced to pay fees to enjoy their statutory rights.

78. As a result of Defendant's violations of the UCL's "unfair" prong, Plaintiff and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money in SPFs and thereby have suffered and will continue to suffer actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the Class demand a jury trial on all claims so triable and judgment against Defendant as follows:

A. An order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative and Plaintiff's counsel be appointed Class Counsel;

B. Declaring that Defendant's policies and practices to be wrongful, unfair, and unconscionable;

C. Ordering BANA to immediately cease the wrongful conduct set forth above and enjoining BANA from conducting business via the unlawful and unfair business acts and practices complained of herein;

D. Restitution of all fees paid to BANA by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E. Actual, punitive, and statutory damages in an amount to be determined at trial;

F. Pre-judgment interest at the maximum rate permitted by applicable law;

G. Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

H. Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: March 2, 2018　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　/s/ Jeffrey D. Kaliel
　　　　　　　　　　　　　　　　　　Jeffrey D. Kaliel (CA Bar No. 238293)
　　　　　　　　　　　　　　　　　　Sophia G. Gold (CA Bar No. 307971)
　　　　　　　　　　　　　　　　　　KALIEL PLLC
　　　　　　　　　　　　　　　　　　1875 Connecticut Ave., NW, 10th Floor
　　　　　　　　　　　　　　　　　　Washington, D.C. 20009
　　　　　　　　　　　　　　　　　　(202) 350-4783
　　　　　　　　　　　　　　　　　　*jkaliel@kalielpllc.com*
　　　　　　　　　　　　　　　　　　*sgold@kalielpllc.com*

　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff and the Putative Class