United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| JAMES FOREMAN, et al.,<br>Plaintiffs,<br>v.<br>BANK OF AMERICA, N.A.,<br>Defendant. | Case No. 18-cv-01375-BLF<br><br>**ORDER GRANTING WITHOUT LEAVE TO AMEND IN PART AND DENYING IN PART MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>[Re: ECF 52] |

This case involves a consumer's right to authorize his bank to transfer funds electronically to third parties through what is aptly named an "electronic fund transfer." Such transfers are governed by the Electronic Fund Transfer Act, 15. U.S.C. § 1693. If a consumer has authorized a financial institution to transfer funds on a recurring basis on his behalf, the EFTA contemplates that the consumer may also "stop payment" of those preauthorized transfers—that is, withdraw his authorization. *Id.* § 1693e. In practice, in order to stop payment, the consumer may be required by his financial institution to pay what is known as a "stop-payment fee." Plaintiffs James Foreman and Alvin Moody allege that Defendant Bank of America, N.A. ("BOA") charges such a fee. Plaintiffs contend that BOA's stop-payment fee violates the EFTA and California's Unfair Competition Law.

Before the Court is BOA's motion to dismiss the Third Amended Class Action Complaint ("TAC"). Mot., ECF 52. For the reasons that follow, the motion to dismiss the is GRANTED WITHOUT LEAVE TO AMEND IN PART AND DENIED IN PART.

///

///

## I. BACKGROUND[1]

Plaintiffs James Foreman and Alvin Moody each have a bank account with Defendant Bank of America, N.A. ("BOA"). Third Am. Compl. ("TAC") ¶ 34, ECF 51. Through its deposit agreement, BOA, like many financial institutions, allows its customers to authorize recurring electronic funds transfers ("EFTs") from their checking accounts to various third parties, to effectuate, for example, the payment of monthly bills. *Id.* ¶¶ 33–42. BOA also allows its customers to stop such payments subject to certain conditions.

In order to stop the payments, a BOA customer must first satisfy certain requirements imposed by BOA in its deposit agreement. First, and most relevant here, BOA requires the customer to pay a $30 "stop-payment fee" ("SPF"). *Id.* ¶¶ 3–4, 30. Every customer must pay this fee, regardless of his or her means. *Id.* ¶ 5. Second, it requires the customers to notify the third-party recipient of the EFT that the customer has withdrawn his or her authorization for the EFT. *Id.* ¶ 38. And third, it requires the customer to provide BOA with the exact details of the pre-authorized transfer, down to the penny, before BOA will stop the payment. *Id.* ¶ 39; *see also id.* ¶¶ 40–41.

Plaintiff James Foreman authorized BOA to transfer funds from his checking account to a third-party lender, whom he alleges was an illegal, predatory lender. *Id.* ¶¶ 43–52. When he learned that the predatory lending scheme was illegal in California, he considered stopping his EFT payment. *Id.* ¶ 48. But when he learned it would cost him $30 to stop his payment, he delayed in stopping the payment for several months and continued paying the illegal loans. *Id.* Eventually, after months of delay, in August 2017 he paid the $30 stop-payment fee. He had to pay the fee again to stop a second predatory loan in November 2017. *Id.* ¶ 50.

Plaintiff Alvin Moody is an indigent consumer whose monthly income comes mostly from Social Security benefits. *Id.* ¶¶ 53–54. In December 2017, he went to BOA and attempted to stop a recurring EFT to his insurance company in accordance with the terms and conditions of his BOA

---

[1] Plaintiffs' well-pled factual allegations are accepted as true for purposes of the motion to dismiss. *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

2

account. *Id.* ¶ 55. He also paid the $30 fee. *Id.* ¶ 56. BOA, however, failed to stop the EFT in December, and the EFT was effectuated on January 3, 2018. *Id.* ¶ 57. BOA then charged Moody a $35 overdraft fee because he had insufficient funds in his account for the transfer. *Id.* ¶ 58.

Plaintiffs allege that BOA's $30 stop-payment fee violates the Electronic Fund Transfer Act ("EFTA"), 15. U.S.C. § 1693, under three alternative theories: (1) SPFs *per se* violate the EFTA, *id.* ¶¶ 8, 72–80; (2) SPFs that exceed the bank's costs of processing stop-payment orders violate the EFTA, *id.* ¶¶ 10, 81–88; and (3) SPFs that "impede and hinder a consumer's exercise of the right to stop payment" violate the EFTA, *id.* ¶ 11, 89–98. Specifically, Plaintiffs claim that the fees violate 15 U.S.C. § 1693e(a), which discusses certain requirements relating to stopping payments. *Id.* ¶¶ 3, 8, 32, 36, 75, 84, 92. Likewise, they claim that BOA's deposit agreement violates 15 U.S.C. § 1693*l*, which states that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by" the EFTA. *Id.* ¶¶ 37, 42, 76, 84, 94.

Based on these purported violations of the law, the TAC asserts seven causes of action.[2] Both Plaintiffs assert three causes of action for violations of the EFTA (15 U.S.C. § 1693m), with a cause of action for each alternative theory set out above. *Id.* ¶¶ 72–98. Plaintiff Foreman asserts three causes of action for violations of California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17204), with a cause of action for a violation of the EFTA for each alternative theory set out above. *Id.* ¶¶ 99–127. And finally, Plaintiff Moody asserts a cause of action for violation of the EFTA (15 U.S.C. § 1693h), for BOA's failure to cancel his EFT upon request. *Id.* ¶¶ 128–38.

The first three causes of action for violations of the EFTA are brought on behalf of a putative class of "[a]ll holders of a [BOA] checking account who, within the applicable statute of limitations, paid one or more SPFs to stop a recurring EFT." *Id.* ¶ 60. The UCL claims are

---

[2] Though Plaintiffs also allege in their TAC and in their opposition other provisions of the agreement that they believe may violate the EFTA, the asserted claims are expressly tied only to the stop-payment fees. *See, e.g.*, TAC ¶¶ 75, 84, 92. In their SAC, Plaintiffs alleged that the additional hinderances contributed to BOA's liability under the EFTA. In the TAC, those same allegations are not levied in support of the claims. Thus, the Court addresses in this order only the stop-payment fee because Plaintiffs have chosen to proceed on theories supported only by the fees.

3

brought on behalf of a subclass of BOA accountholders in California who paid an SPF. *Id.*

The Court previously granted BOA's motion to dismiss the Second Amended Complaint ("SAC"). *See* ECF 50. The Court held that the SAC did not clearly delineate Plaintiff's theory (or theories) of liability under the EFTA and that Plaintiffs' allegations were internally inconsistent. *See id.* at 4–5. It also held that Plaintiffs had not alleged that they "personally were impeded, hindered, or delayed by the $30 SPF," such that they had not alleged a "causal link between BOA's impositions and Plaintiffs' abilities to exercise their rights to stop payments under the EFTA." *Id.* at 6. As to Plaintiff Moody's individual claim, the Court held that while Moody had "allege[d] facts that could state a claim under the EFTA," he had not actually asserted a related claim in the SAC. *Id.* at 6. The Court granted with leave to amend, and Plaintiffs filed their TAC, which more clearly delineates the three theories of liability recounted above.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at 1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.* However, a strong showing with respect to one of the other factors may

4

warrant denial of leave to amend. *Id.*

**III.  DISCUSSION**

BOA moves to dismiss all of the claims in Plaintiffs' TAC. *See generally* Mot. BOA makes the following arguments for why various claims should be dismissed: (1) Plaintiffs do not have standing to bring the EFTA claims (except Moody's individual claim); (2) the EFTA does not prohibit stop payment fees under any of Plaintiffs' three theories; (3) Moody has not alleged an individual EFTA claim; and (4) the UCL claims are unsustainable either because they are preempted by the National Banking Act or because there is no predicate EFTA violation to sustain them.

The Court discusses each argument in turn, except the UCL claims, which it discusses alongside each of the related EFTA theories.

**A.  Plaintiffs' Standing**

BOA argues that "Plaintiffs lack standing to challenge the stop-payment fee because they cannot allege that the fee impaired their ability to stop payment"—*i.e.* that the fee injured them.

Anyone seeking "to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To establish standing, a plaintiff must demonstrate (1) an "injury in fact," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish injury in fact, a plaintiff must show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).

BOA concedes in reply (by failing to reargue the point) that Foreman and Moody have standing to bring their claims that the stop-payment fee *per se* violates the EFTA. *See* Reply at 2–3, ECF 58. Plaintiffs allege they were forced to pay BOA an unlawful fee, which constitutes an economic injury sufficient to confer standing. *See, e.g.*, *Lindblom v. Santander Consumer USA Inc.*, No. 1:15-cv-990, 2018 WL 500347, at *5 (E.D. Cal. Jan. 22, 2018). Though BOA only

concedes this point with respect to the *per se* violation, this argument applies equally to the second theory—that BOA's fee violates the EFTA because it exceeds BOA's costs. If these facts are true and violate the EFTA, Plaintiffs similarly were forced to pay an unlawful fee, causing them economic harm.

Plaintiffs' third theory requires that the fee impede or hinder Plaintiffs' right to stop payment. Plaintiff Foreman has alleged that BOA's fee hindered him from stopping payment for several months and that he was trapped in an illegal predatory lending scheme as a result. TAC ¶¶ 48–49, 93. These allegations are sufficient to plausibly allege that BOA's fee hindered Foreman's right to stop payment, and that he suffered the harm of remaining in a predatory lending scheme as a result.

Because Plaintiff Foreman has standing to assert each of Plaintiffs' three theories, and because the Court ultimately dismisses each theory without leave to amend, the Court need not address whether Plaintiff Moody also has standing to assert theory three. The Court notes generally that although Plaintiff Moody has not made allegations similar to those in Paragraph 93 of the Third Amended Complaint, he may have standing based on his alleged waiver of rights under Paragraph 94 or as a member of the purported class under Paragraph 95.

### B. Plaintiffs' Theories of Liability Under the EFTA

BOA argues that each of Plaintiffs' theories of liability under EFTA § 1693e fails because the EFTA does not prohibit the imposition of stop-payment fees, whereas the National Banking Act, 12 U.S.C. § 24 (Seventh), as interpreted by the Office of the Comptroller of the Currency ("OCC"), grants national banks the discretion to impose fees related to the business of banking. *See* Mot. at 6–10. Moreover, BOA argues that because § 1693e is not violated, the EFTA's anti-waiver provision § 1693*l* is likewise not violated. *Id.* at 10–13. Finally, BOA argues that the Court must dismiss Plaintiffs' theory of liability that banks can only charge stop-payment fees commensurate with the cost of stopping payment because the OCC has the sole authority to regulate the reasonableness of fees. *Id.* at 13–15.

The Court discusses each of these arguments when relevant to discussing the validity of Plaintiffs' three theories.

6

### 1. Theory 1: The EFTA Does Not Prohibit Stop Payment Fees *Per Se* (Claims 1 and 4)

Section 1693e of the Electronic Fund Transfer Act governs "Preauthorized transfers," defined in the Act as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10). Section 1693e(a), states in full:

> A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made. A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. The financial institution may require written confirmation to be provided to it within fourteen days of an oral notification if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent.

Plaintiffs argue that the second and third sentences of 1693(e) "grant[] consumers a substantive right to 'stop payment of a preauthorized electronic fund transfer'" pursuant to two conditions, and two conditions only: (1) the consumer must "notify the bank three days in advance"; and (2) must "provide written confirmation within fourteen days, if requested." Opp. at 7. According to Plaintiffs, under the statutory-interpretation doctrine of *expressio unius est exclusio alterius*, no additional limitations may be placed on a consumer's right to stop payment, including stop-payment fees. *Id.* Plaintiffs also argue that the "legislative history, historical context, and express purpose" of the EFTA confirm this reading of the statute. *Id.* at 7–10.

The Court disagrees. The EFTA's language unambiguously does not prohibit stop-payment fees, and the legislative history of the Act and Ninth Circuit precedent confirm this conclusion.

"As with all statutory interpretation questions," the Court "must begin with the plain language of the statute." *Negusie v. Holder*, 555 U.S. 511, 542 (2009). If the "statutory text is plain and unambiguous," the Court "must apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). "Only when statutes are ambiguous may courts look to legislative history." *In re Del Biaggio*, 834 F.3d 1003, 1010 (9th Cir. 2016). A statute must be "susceptible to more than one reasonable interpretation" to be ambiguous. *Alaska Wilderness League v. E.P.A.*, 727 F.3d 934, 938 (9th Cir. 2013). "The plainness or ambiguity of statutory

language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

When read in the context of the EFTA as a whole, § 1693e unambiguously does not prohibit stop-payment fees. Most importantly, § 1693e has nothing to say about fees at all—it does not expressly prohibit them, as one might expect were it to bar such fees entirely. Even so, silence does not unambiguously require allowance, so a close read is required.

In context, § 1693e's silence on fees should be read not to bar them. As Plaintiffs note, "[t]he primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b). But another purpose of the EFTA is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." *Id.* Thus, the EFTA aims to clarify the rights and responsibilities for all participants in EFTs, including financial institutions. Indeed, through the EFTA, Congress attempted to clarify "the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers," which, due to "the unique characteristics of [EFT] systems," were previously "undefined." 15 U.S.C. § 1693(a).

> In an effort to serve these stated purposes, the EFTA's provisions
> 
> are aimed at promoting disclosure, preventing fraud[,] and allocating liability. *See* 15 U.S.C. § 1693c (requiring disclosure of terms and conditions of electronic transfers); § 1693d (requiring documentation of transfers); § 1693e (requiring a writing for preauthorized electronic fund transfers); § 1693f (establishing procedures for error resolution); § 1693g (outlining consumer liability); § 1693h (outlining the liability of financial institutions); § 1693i (establishing requirements for issuance of cards); § 1693j (suspending consumer obligations in instances of system malfunction); § 1693l (prohibiting waiver of consumer rights under the EFTA)."

*Bank of Am. v. City & Cty. of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 20, 2002); *see also Wike v. Vertrue, Inc.*, 566 F.3d 590, 592 (6th Cir. 2009) ("The statute . . . subjects [EFTs] to a litany of procedural requirements designed to protect consumers from transactions made in error or without their consent."). Put another way, some of the EFTA's substantive provisions prescribe disclosure, notice, and documentation requirements aimed at promoting disclosure and preventing fraud, while other

provisions set forth the various participants' liabilities. *See* 15 U.S.C. §§ 1693g, 1693h.

Section 1693e is a substantive provision fairly characterized as prescribing the disclosure, notice, and documentation requirements for preauthorized EFTs. The first sentence of § 1693e(a) sets forth the notification requirements with which consumers must comply in order to authorize a preauthorized EFT. Such EFTs "may be authorized by the consumer only in writing." 15 U.S.C. § 1693e(a). And it sets forth the notification requirements with which the financial institution must comply, stating that "a copy of such authorization shall be provided to the consumer when made." The second and third sentences then set forth the notification requirements with which consumers must comply in order to *stop* a preauthorized EFT. While authorizing a preauthorized EFT requires a writing, "[a] consumer may stop payment of a preauthorized [EFT] by notifying the financial institution orally or in writing." *Id.* But if the consumer chooses to stop the payment orally, "[t]he financial institution may require written confirmation to be provided." Like § 1693e(a), § 1693e(b) prescribes the notification requirements with which financial institutions must comply when a preauthorized transfer varies in amount, stating that the institution must "provide reasonable advance notice to the consumer . . . of the amount transferred and the scheduled date of transfer." 15 U.S.C. § 1693e(b).

Thus, on its face, § 1693e governs the notification requirements for preauthorized EFTs and nothing more. This reading is especially warranted because other provisions of the EFTA are likewise targeted at disclosure, notice, and documentation. Section 1693e does not, by contrast, delimit the entire universe of requirements governing stopping preauthorized payments (or authorizing them in the first instance, for that matter). That is, the notification requirements set forth in § 1693e are not, contrary to Plaintiffs' argument, the only two conditions imposed on stopping payment as a whole. Given the targeted nature of this provision, the interpretive tool of *expressio unius* does not dictate the result Plaintiffs assert here.

The specific language of other provisions in the EFTA further confirm that § 1693e does not define the entire universe of conditions for stopping payment. Two other sections of the EFTA contemplate that the financial institution may impose terms and conditions for stopping payment beyond the conditions set forth in § 1693e. Section 1693c requires, in part, that the

9

financial institution disclose to the consumer "the terms and conditions of electronic fund transfers." 15 U.S.C. § 1693c(a). These disclosures must include "the consumer's right to stop payment of a preauthorized electronic fund transfer *and the procedure to initiate such a stop payment order*." *Id.* § 1693c(a)(5) (emphasis added). Similarly, § 1693h governs the liability of financial institutions for failure, in part, to stop payment when requested. *Id.* § 1693h(a)(3). This section only confers liability on the institution when the stop payment instruction is made "in accordance with the terms and conditions of the account." *Id.* Given that both of these sections contemplate that the consumer must comply with specific terms and conditions before stopping payment, they indicate that § 1693e does not comprehensively define the conditions for stopping payment. Plaintiffs' argument that these sections may relate only to "neutral procedural matters" that are "unobjectionable"—such as the bank's phone number—finds no support in the text of the Act. Similarly, their argument that these contemplated terms and conditions may relate to a fee the bank could charge for *establishing* an EFT, as opposed to stopping payment, finds no support in the Act.

Having reviewed the statute's text, the Court finds that the EFTA unambiguously does not *per se* prohibit stop-payment fees.

The Ninth Circuit's decision in *Bank of America v. City and County of San Francisco*, 309 F.3d 551 (9th Cir. 2002) confirms this result. Though this Court need not consider the legislative history of the statute because it finds the statute unambiguous, *Bank of America* indicates that the legislative history likewise confirms this result.

In *Bank of America*, the Ninth Circuit held that "regulation of ATM fees is not the type of consumer protection measure contemplated by the EFTA." 309 F.3d at 564. In that case, various banks challenged city ordinances prohibiting banks from charging ATM fees to non-depositors. *See id.* at 555–57. The banks argued that the ordinances were preempted by the National Bank Act and the Home Owners' Loan Act. The cities countered that the EFTA's anti-preemption provision "permit[ted] the cities to regulate ATM fees as a consumer protection measure." *Id.* at 557. The Ninth Circuit held that that the Home Owners' Loan Act and the National Bank Act preempted the ordinance, and that the EFTA did not save the ordinances from preemption. *Id.* at

10

559–65.

With respect to the EFTA, the cities claimed that the ordinances' "prohibition of ATM fees [was] the type of consumer protection measure contemplated by the EFTA"—specifically because the ordinances sought to "protect consumers against 'excessive fees' and 'anti-competitive' business practices." *Id.* at 564. The Ninth Circuit rejected this argument on two grounds, the first of which was that "regulation of ATM fees is not the type of consumer protection measure contemplated by the EFTA," as evidenced by the EFTA's language and legislative history. *Id.*

Starting with the language of the Act, the Ninth Circuit noted that the EFTA contemplates consumer protection measures "aimed at promoting disclosure, preventing fraud, and allocating liability." *Id.* (citing various provisions of the EFTA, including § 1693e). Turning to the legislative history of the EFTA, the Ninth Circuit confirmed that "[t]he EFTA was enacted to prevent fraud, embezzlement, and unauthorized disclosure in electronic fund transfers, not to regulate service fees charged by financial institutions." *Id.* In so holding, the Ninth Circuit cited several cases that analyzed the legislative history of the EFTA and found that the EFTA aimed to reduce potential fraud by mandating measures that could alleviate problems associated with conducting fund transfers without any human interaction:

> *See Kashanchi v. Texas Commerce Med. Bank*, 703 F.2d 936, 940–41 (5th Cir. 1983) (noting that the "lack of a written record" and the "absence of any human contact" in electronic fund transfers were factors that "motivated Congress to pass the EFTA."), citing H.R.Rep. No. 95–1315, at 2 (1978) (Congress passed the EFTA because of its concern that electronic transactions were "much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods."); *Wachter v. Denver Nat'l Bank*, 751 F.Supp. 906, 908 (D.Colo.1990).

*Bank of Am.*, 309 F.3d at 564; *see also Spain v. Union Tr.*, 674 F. Supp. 1496, 1500 (D. Conn. 1987) ("The legislation was designed to create rights for the consumer and help bring certainty to an era of banking which was fast becoming faceless, an era wherein banking could be conducted almost exclusively through machines." (citing S.Rep. No. 95-915, at 3 (1978)). The statutory text and legislative history thus confirmed that "the EFTA does not regulate ATM fees" because "[p]rohibition of ATM fees is not the type of consumer protection measures contemplated by the EFTA." *Id.*

The Ninth Circuit's evaluation of the EFTA's history and purposes with respect to ATM

11

fees applies equally to stop-payment fees and confirms this Court's reading of the statute above.[3] As the Ninth Circuit recognized, the EFTA aimed to promote disclosure, prevent fraud, and allocate liabilities. None of those goals is aimed at "regulat[ing] service fees charged by financial institutions." *Id.* Reading § 1693e to contain notification requirements only and not as setting forth the universe of conditions for stopping payments fully comports with this legislative history.

Plaintiffs' legislative-history cites do not contradict this result. Those cites say nothing whatsoever about stop-payment fees. Plaintiffs cite numerous articles and cases contemporaneous to the passage of the EFTA for the contention that "Congress likely intended the EFTA to codify th[e] recognized right to revoke authorization for payment as to newly emerging EFTs and to specify the conditions governing such revocations." *See* Opp. at 9; *see also id.* at 7–10 (citing sources). But Plaintiffs' cited sources stand only for the first proposition—that consumers have the right to stop payment. The Court does not hold that consumers do not have the right to stop payment. The Court holds only that § 1693e does not define that right to prohibit stop-payment fees *per se*. None of Plaintiffs' cited sources stand for the proposition that consumers must be allowed to stop payment for free. The sources Plaintiffs cite for the proposition that banks are to bear the costs of stopping payment actually refer to banks bearing the costs of a *failure* to stop payment. *See, e.g.*, *Sunshine v. Bankers Tr. Co.*, 314 N.E.2d 860, 865 n.5 (1974) ("[I]t should be pointed out that an implicit assertion underlying many of appellant's arguments is that a bank cannot be made to suffer a loss by *paying over* a timely stop order." (emphasis added)); U.C.C. § 4-403, cmt. 2 (1978) ("The inevitable occasional losses through *failure to stop* should be borne by the banks as a cost of the business of banking." (emphasis added)). Thus, Plaintiffs' cites are insufficient to persuade the Court that it should read into the EFTA what is simply not there.

In sum, the Court concludes as a matter of law that § 1693e does not bar stop-payment fees

---

[3] The Ninth Circuit also relied on the fact that after Congress passed the EFTA it passed the ATM Fee Reform Act of 1999, which requires ATM operators to notify customers when they will impose a fee. *Bank of Am.*, 309 F.3d at 565. "By requiring that ATM operators notify customers of imposition of fees, Congress recognized that ATM operators can charge fees." *Id.* Though the parties have not pointed to a similar subsequent bill passed in the stop-payment fee context, the Ninth Circuit's reasoning with respect to the statutory text and legislative history of the EFTA applies equally to such fees.

*per se*. Because Plaintiffs have not alleged under this theory that BOA's $30 fee violated § 1693e, they also have not alleged that Plaintiffs were forced to waive their rights to stop payment under § 1693*l* of the EFTA.

Because this is a question of law that amendment cannot cure, Plaintiffs' first claim for violation of the EFTA is DISMISSED WITH PREJUDICE. Likewise, claim four for violation of the UCL based on a violation of the EFTA on this theory is DISMISSED WITH PREJUDICE.

### 2. Theory 2: The EFTA Does Not Bar Stop-Payment Fees that Exceed the Costs of Processing Stop-Payment Orders (Claims 2 and 5)

Having held that the EFTA does not *per se* prohibit stop-payment fees, the next question is whether the EFTA sets a cap on the fees a bank can charge for stop payments. The answer is no.

Plaintiffs' second theory is that BOA's $30 fee violates the EFTA because "[t]he amount of the $30 SPF is not tied to any actual costs incurred by [BOA] to cancel preauthorized EFT, and, in fact, grossly exceeds any such costs." TAC ¶ 84. Plaintiffs argue that even if the EFTA does not prohibit fees *per se*, it prohibits fees that are not tied to the bank's actual costs of stopping payment. *See* Opp. at 11–12. This is so, Plaintiffs argue, because to the extent banks have the right to charge fees under the EFTA, those fees must be bound by some metric, and cost is a metric that Congress at least "plausibl[y]" intended. *Id.* at 11 (citing 12 C.F.R. § 7.4002).

The Court agrees with BOA that this theory fails as a matter of law because the EFTA does not allow this Court to determine the reasonableness of a bank's fees.

This result follows directly from the discussion above. The EFTA and its legislative history say nothing about fees charged for stopping payment, much less how the reasonableness of any such fees should be determined—such as through proportion to the bank's actual costs. Plaintiffs provide no basis in the law (or the legislative history) for reading this limitation into the Act.

Indeed, the only source Plaintiffs cite for this theory is not the EFTA, but rather the governing regulations of the National Bank Act of 1864 ("NBA"), 12 U.S.C. § 24. The Court agrees that the NBA and its regulations *do* prescribe guidelines for fees like stop-payment fees. The NBA confers upon national banks the authority:

13

> To exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . .

12 U.S.C. § 24 (Seventh). "The 'business of banking' is not limited to the powers enumerated in § 24 (Seventh)." *Bank of Am.*, 309 F.3d at 562. That is, "[t]he incidental powers of national banks are . . . not limited to activities deemed essential to the exercise of enumerated powers but include activities closely related to banking and useful in carrying out the business of banking." *Id.*

"The OCC is authorized to define the 'incidental powers' of national banks beyond those specifically enumerated." *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 724 (9th Cir. 2012). "The OCC has interpreted these incidental powers to include the power to set account terms and the power to charge customers non-interest charges and fees. . . ." *Id.* (citing 12 C.F.R. § 7.4002(a)). "More specifically, the OCC has determined that '[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles.'" *Id.* (quoting 12 C.F.R. § 7.4002(b)(2)). Thus, while the EFTA is silent on stop-payment fees, the NBA, as implemented by the OCC, expressly allows them, as long as they comply with OCC regulations.

Plaintiffs' cite to the NBA regulations rather than the EFTA makes complete sense then, because the NBA (and its regulations) provide guidance on the reasonableness of fees, including whether the fee is related to the cost incurred for the service. *See* 12 C.F.R. § 7.4002(b). At bottom then, Plaintiffs' second theory looks more like a challenge to BOA's $30 stop-payment fee under the *NBA*, not under the EFTA. The NBA's regulations, not the EFTA, are what contemplate that fees might be tied to costs. The EFTA is silent on this front, and nothing in its history indicates that Congress intended to tether fees to the costs of stopping payment. Thus, Plaintiffs' second theory fails as well.

BOA argues that because the NBA governs the fees here, the Court does not have jurisdiction in any event to decide the reasonableness of fees, because that role is exclusively in the purview of the OCC. *See* Mot. at 13–14. While the Court ultimately agrees that Plaintiffs'

theory more squarely sounds in the NBA, the Court does not do so based on the alleged exclusivity of the OCC for two reasons. First, Plaintiffs are correct that they do not bring a claim under NBA or its regulations, such that the OCC's "exclusive purview" does not apply. As the Ninth Circuit in *Deming v. Merrill Lunch & Co.* held, the OCC has exclusive purview over "the regulation of a national bank's adherence to OCC regulations." 528 F. App'x 775, 778 (9th Cir. 2013). Here, Plaintiffs' do not argue that BOA did not adhere to the OCC regulations.

Second, it is not clear that the Ninth Circuit's holdings with respect to the OCC's "exclusive purview" precludes a court from reviewing whether a bank has complied with the OCC's regulations, as BOA argues. In each of BOA's cited cases except *Deming*, the Ninth Circuit discussed the exclusive purview of the OCC with respect to preemption, thus excluding the right of *states* to regulate fees, not the rights of courts to determine if a bank has violated the OCC regulations. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 556 n.8 (9th Cir. 2010) (holding state law preempted); *Gutierrez*, 704 F.3d at 724–25 (same). The Court recognizes that *Deming* can be read to hold that a plaintiff cannot levy challenges to fees under the regulations even under federal law (as opposed to state law). *See* 528 F. App'x at 778 (holding Real Estate Settlement Procedure Act claim based on violation of OCC regulations was "fruitless" due to OCC's exclusive purview). However, *Deming*, an unpublished memorandum disposition, cites only to a footnote in *Martinez* in support of this proposition, and the *Martinez* court was examining the issue in the context of preemption. Moreover, *Martinez* cited a Supreme Court case concerning *states'* rights to conduct activities that were in the exclusive purview of the OCC. *See Martinez*, 598 F.3d at 556 n.8 (quoting *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13 (2007) ("In particular, real estate lending, when conducted by a national bank, is immune from state visitorial control: The NBA specifically vests exclusive authority to examine and inspect in OCC."). Thus, it is not entirely clear that the Court is barred from deciding whether a fee violates the OCC regulations. But in any event, as discussed, the Court need not decide if it is without jurisdiction to determine whether BOA has violated the OCC regulations, because Plaintiffs do not bring such a claim.

In sum, the Court concludes as a matter of law that § 1693e does not bar stop-payment fees

that exceed the costs of processing stop-payment orders. Because Plaintiffs have not alleged under this theory that BOA's $30 fee violated § 1693e, they also have not alleged that Plaintiffs were forced to waive their rights to stop payment under § 1693*l* of the EFTA.

Because this is a question of law that amendment cannot cure, Plaintiffs' second claim for violation of the EFTA is DISMISSED WITH PREJUDICE. Likewise, claim five for violation of the UCL based on a violation of the EFTA on this theory is DISMISSED WITH PREJUDICE.

### 3. Theory 3: The EFTA Does Not Dictate that Any Fee that Impedes, Hinders, or Delays a Consumer's Right to Stop Payment is Unlawful (Claims 3 and 6)

Plaintiffs' final theory is that the EFTA bars fees that "impede and hinder a consumer's exercise of his or her right to stop payment." TAC ¶ 22. In their opposition, Plaintiffs frame this theory somewhat differently, saying "[i]f the EFTA means anything, it means banks cannot impose conditions on the right to cancel [EFTs] that undermine the EFTA's purpose." Opp. at 12. Essentially, Plaintiffs argue that because the EFTA provides the substantive right to stop payment, "[i]t must, at a minimum, prevent banks from imposing fees on EFT cancellations that impede and hinder the very right the EFTA expressly grants." Opp. at 12.

This theory is simply a repackaging of Plaintiffs' prior two theories and must be rejected for the same reasons. Again, and most importantly, the "hinders and delays" language finds no basis in the EFTA. Plaintiffs' whole theory rests on the language of § 1693e, which simply contemplates stopping payment by providing written notice.

To the extent Plaintiffs' theory rests on the idea that any fee (including the $30 one here) hinders or delays a consumer's right to stop payment, it is the same as theory 1 and is dismissed for the same reasons. Plaintiffs' arguments in opposition support this interpretation of theory 3 because they cite a case holding that *any* impediment on stopping payment outside the conditions delineated in § 1693e violates the EFTA. *See* Opp. at 13–14 (citing *Simone v. M & M Fitness LLC*, No. 16-cv-1229, 2017 WL 1318012, at *4 (D. Ariz. Apr. 10, 2017)). The Court discusses *Simone* in more detail below but notes here that Plaintiffs' reliance on this holding implies that they believe any fee (because such fee is not enumerated in § 1693e) impedes or hinders the right to stop payment and thus is not allowed. The Court has rejected this argument above.

16

To the extent Plaintiffs' theory rests on the idea that a $30 fee (as opposed to a $1 or $5 or $29 fee) impedes everyone's right to stop payment under the EFTA as a matter of law, the Court must reject this theory as it did theory 2. The EFTA provides the Court no guidance on how to determine whether a certain fee charged under it is reasonable or unreasonable—*i.e.*, is sufficiently low or is too high. This makes sense, because the Court has concluded that the EFTA does not prohibit or regulate fees, and indeed has nothing to say about them whatsoever. Though Plaintiffs analogize to several areas of Constitutional law in which courts must decide how much of a burden on a right is too much, *see* Opp. at 11, the same reasoning does not apply to a federal statute that is silent on the issue. In the case of statutes, the Court is bound by what the statute says and what Congress intended it to do. Nothing in the text or legislative history of the EFTA shows that Congress meant the EFTA to prohibit fees that hinder or impede the right to stop payment, and the Court declines to read into the statute a right (to be free from fees) that it did not contemplate creating.

The opinion in *Simone*, 2017 WL 1318012, does not change the Court's view on this issue. In *Simone*, when the plaintiff joined the defendant's gym, she set up an EFT for her monthly gym payments and signed an Agreement with the gym that required her to contact the gym before attempting to stop payment of the EFT. *Id.* at *1. She brought suit claiming the agreement required her to waive her rights under EFTA § 1693*l*. In denying the gym's motion for summary judgment, the court agreed with the plaintiff, holding that "[t]he EFTA's language precludes such hindrance—no matter how slight." *Id.* at *3. In so holding, the court held that "the EFTA confers consumers with an absolute right to stop payment under its terms and no agreement can impinge on that entitlement." *Id.* Because the EFTA "does not require that a consumer provide notice to a payee before stopping payment," the agreement ran afoul of the EFTA's prescriptions. *Id.*

*Simone* is not persuasive here for several reasons. First, it is not binding authority on this court. Second, it involves a different factual scenario, wherein a third party agreement (as opposed to a bank's agreement) imposed an imposition on stopping payment, even though the third-party, unlike a bank, has no control over the EFT. Third, in reaching its decision, the court in *Simone* did not discuss the EFTA's purposes, the other provisions of the EFTA, the legislative

United States District Court
Northern District of California

17

history of the EFTA, or any case law in support of its interpretation of § 1693e. Fourth, and perhaps most importantly for the present purposes, the *Simone* court's reading of § 1693e (on the facts of that case) does not conflict with this Court's reading of the statute. There, the agreement contained *notification requirements* not contemplated by § 1693e. Under this Court's reading of the statute, at most § 1693e could be read to define, via *expressio unius*, the universe of conditions for *notice* with respect to stopping payment. Thus, the *Simone* court may be correct that additional notice requirements are not allowed under the EFTA. *See also Baldukas v. B & R Check Holders, Inc.*, No. 12-CV-01330-CMA-BNB, 2012 WL 7681733, at *5 (D. Colo. Oct. 1, 2012), *report and recommendation adopted sub nom. Baldukas v. B & R Check Holders*, 2013 WL 950847 (D. Colo. Mar. 8, 2013). This case, by contrast, deals with stop-payment fees, not stop-payment notice.[4] For these reasons, *Simone* is not persuasive.

In sum, the Court concludes as a matter of law that § 1693e does not bar stop-payment fees that impede, hinder, or delay the right to stop payment. Because Plaintiffs have not alleged under this theory that BOA's $30 fee violated § 1693e, they also have not alleged that Plaintiffs were forced to waive their rights to stop payment under § 1693*l* of the EFTA.

Because this is a question of law that amendment cannot cure, Plaintiffs' third claim for violation of the EFTA is DISMISSED WITH PREJUDICE. Likewise, claim six for violation of the UCL based on a violation of the EFTA on this theory is DISMISSED WITH PREJUDICE.

### C. Plaintiff Moody's Individual Claim

In its order granting BOA's motion to dismiss the SAC, the Court held that "Moody alleges facts that could state a claim under the EFTA" for a violation of 15 U.S.C. § 1693h, but that he had failed to bring such a claim. ECF 50 at 6. Moody has remedied this error by bringing an individual claim under that section, and the Court finds such a claim well pled.

BOA's motion is DENIED on this claim.

///

///

---

[4] *See supra* note 2 with respect to other alleged hinderances contained in BOA's agreement.

18

## IV. ORDER

For the reasons set forth about, BOA's motions is GRANTED WITHOUT LEAVE TO AMEND IN PART and DENIED IN PART. All of the claims of the TAC are DISMISSED WITH PREJUDICE, except Plaintiff Moody's individual claim under 15 U.S.C. § 1693h.

**IT IS SO ORDERED.**

Dated: August 13, 2019

BETH LABSON FREEMAN
United States District Judge